The STATE of Missouri, at the Relation of
the Judges for the 21st Judicial Circuit
of the State of Missouri, Relators,

v.

ST. LOUIS COUNTY, Missouri et
al., Respondents.

No. 62114.

Supreme Court of Missouri,
En Banc.

July 15, 1980.

Rehearing Denied Sept. 9, 1980.

Shulamith Simon, Husch, Eppenberger,
Donahue, Elson & Cornfeld, St. Louis, for
relators.

Thomas W. Wehrle, St. Louis County
Counselor, Clayton, for respondents.

## ORIGINAL PROCEEDING IN MANDAMUS

SEILER, Judge.

This is another of the annual disputes
which take place in St. Louis County over
the juvenile court budget. The judges of
the 21st judicial circuit (St. Louis county)
seek the issuance of a writ of mandamus
directing the county and its officials to ap-
prove relators' budget estimate, as modi-
fied, for juvenile court administration for
1980, after the county council had instead
adopted a budget which eliminated twenty-
two positions included in the relators'
amended budget estimate.

The budget year in St. Louis county runs
from January 1 to December 31. During
the summer of 1979, relators submitted
their budget estimates for 1980, including
that for the juvenile court. The county
executive's recommendations would have
deleted various proposed expenditures, in-
cluding the twenty-two positions in ques-
tion. On December 4, 1979, there was a
public hearing on the proposed 1980 budget.
Representatives of various civic organiza-
tions, public officials and county residents
appeared and urged the county council to
fund the juvenile court budget in full and
to reject the proposed budget cuts. On
December 6, 1979, Judge Corrigan, the
judge of the juvenile court, appeared before

the county council in support of the budget estimates. The record contains a transcript of his remarks. Judge Corrigan also submitted a memorandum responding to the proposed budget deletions and a report, entitled "State of the Juvenile Court." The latter set forth the reorganization made by Judge Corrigan [1] in the juvenile court operation to improve internal accountability and communication, public accountability and responsiveness, and improved cooperation with the police and the schools. One of the reorganized departments was the court-community intake department, which has twenty of the disputed positions, and another was the clinical services unit, which has two of the disputed positions. There also were letters and telegrams sent to the council during December 1979 and January 1980 in support of the juvenile court from various legislative, school, law enforcement, and civic representatives and groups.

On January 3, 1980, the county council approved a budget which would have restored the twenty-two positions in the clinical services department and the court-community intake department which had been proposed for deletion. The bill approving the budget was vetoed by the county executive.

Thereafter relators through the juvenile court judge discussed the budget estimate for juvenile court administration with representatives of the council and relators modified their budget estimates. On February 28, 1980, the council approved the proposed budget as modified, which included the twenty-two positions in dispute. Again, however, the budget was vetoed by the county executive.

On March 27, 1980, a bill approving another proposed budget for 1980 was introduced and upon suspension of the rules was perfected and passed. The following day it was approved by the county executive. This budget ordinance eliminated the twenty-two positions in dispute, totalling $353,089 in salaries.

On April 1, 1980, the relators notified the county council that the circuit court could not consent to the reductions, stating that the proposed reductions would impair the availability and quality of the judicial system and would hamper the court in carrying out its constitutional and statutory functions. The relators requested immediate reconsideration and stated their willingness to review again the need for the funds and the severe impairment of the proper functioning of the juvenile court which would result from the cuts.

On April 1, 1980, counsel for respondents notified relators that the county did not intend to take any legal action in the matter and notified the employees whose positions were not funded that they would not be paid for any work after April 12, 1980. Counsel took the position that personnel employed in court-community services [2] had been ruled not reasonably necessary for the functioning of the court in the decision of *In re 1979 Budget of the Juvenile Court of St. Louis County*, 590 S.W.2d 900 (Mo. banc 1979). In the respondents' return herein, respondents amplify that position to say that the same is also true of the diagnostic treatment services program.[3] Respondents say further that the testimony at the public hearings and the documentary material submitted by relators show that the items deleted from the 1980 juvenile court budget

---

1. Judge Corrigan was assigned to the juvenile court division on or about January 1, 1979.

2. In the reorganization mentioned earlier, Judge Corrigan combined the former court-community services with the delinquency intake and neglect intake units as part of the new court-community intake department, which now has four units: neglect intake, serious offender intake and two field investigation units.

3. In the reorganization program, the personnel formerly assigned to the diagnostic treatment program now make up the clinical services department. Relators assert the project for which funding was rejected in 1979 dealt primarily with the violent offender and also with various consultations in consent cases and in workshops for parents and children. The duties of the personnel are now confined to diagnosis and treatment of juveniles to aid the court in dispositional and probation decisions and psychological evaluation of parents, guardians and prospective foster parents.

were the same items which this court held could be deleted from the 1979 budget in the above mentioned case; respondents say further that the issue of whether the positions in question are reasonably necessary for the functioning of the juvenile court has already been decided by this court against relators in the case mentioned above and that the issues raised by relator herein are therefore res judicata. Respondents conclude by asserting that there were no facts submitted to respondents that the juvenile court would not be able to perform its essential functions without the twenty-two positions which are here in dispute.

The relators on April 7, 1980, instituted the present mandamus action.

In *State ex rel. Weinstein v. St. Louis County*, 451 S.W.2d 99, 102 (Mo. banc 1970), we outline the procedure to be followed when conventional methods fail as follows:

"If, after the juvenile court, acting under the supervisory control of the circuit court of St. Louis county, determines its needs as to personnel and fixes compensation, the county council deems such action to be unreasonable, the county council may file a petition for review and final determination of such question in this Court . . . Necessarily, in order not to interfere with operations of the juvenile court, such petition must be filed without unnecessary delay. *In the absence of a determination, pursuant to such petition for review, that action of the juvenile court is unreasonable, its order with respect to the personnel reasonably needed and their compensation will be final, and under such circumstances mandamus will lie, if necessary, to compel payment.*" (Emphasis supplied).

Here the county council has seen fit not to file a petition for review. One reason given is that the matter is res judicata, it having been decided in the 1979 budget case that positions of the type in question here were not required to be funded. Upon the meager record before us in that petition for review case (meager at least from the standpoint of the juvenile court), we concluded that certain experimental projects

were *not* expenditures fixed by statute or absolutely reposed in the discretion of the juvenile court and finally that the juvenile court had failed to carry its burden of proving that its expenditures sought to be authorized were reasonably necessary and constituted a factual and not merely a declared need. *In re 1979 Budget of the Juvenile Court of St. Louis County,* 590 S.W.2d at 901–02. In the 1979 case, $127,-597 of the $262,651 requested for the court-community services program (the predecessor, as we understand it, of the current court-community intake department) was deleted and 'all the $110,504 requested for the diagnostic treatment services program was deleted.

■ We do not agree that res judicata, estoppel by judgment, estoppel by verdict or collateral estoppel applies here so that the 1979 decision forecloses the position of the relators. We did not there declare that under no circumstances could a court-community intake department or a clinical services department (which the council equates with the diagnostic treatment services program proposed for the 1979 budget) be a proper subject for juvenile court expenditures. This is not a second suit involving the same cause of action, because a different fiscal year is involved. The budget for the juvenile court for each year necessarily is a separate and distinct proposition, just as are annual taxes, the collection of which we have held does not involve res judicata, *Kansas City v. Graybar Electric Co.,* 485 S.W.2d 38 (Mo. banc 1972) and *In re Breuer's Income Tax,* 354 Mo. 578, 190 S.W.2d 248 (1945). It does not follow that because justification for part of the budget was not shown one year that justification for the same or similar type of expenditure cannot be shown the following year. Nor do the facts, as presented by affidavit of respondent's budget director, that the twenty-two positions deleted from the 1980 budget are positions which were also deleted from the 1979 budget, that two of the positions requested in the 1978 budget were the same as those deleted in 1979 and 1980 and that twenty of the positions which were

funded for the last three months of 1978 in the court-community services program were the same positions deleted in 1979 and 1980, establish that they need not be funded in 1980.

■ Here, for example, the juvenile court judge has undertaken a complete reorganization of juvenile court administration. There is no way to determine in advance whether the reorganization will prove successful. Yet the plan was devised and recommended in good faith by the juvenile judge, who is much closer to the problem than are we or the county council, and it was approved by the other circuit judges making up the circuit court of the county. As we understand it, under the proposed reorganization, in the court-community intake department the twenty persons whose positions are in dispute here would be used in the field, primarily at municipal police departments, for prompt on-site availability when a juvenile is taken into custody, at which point the juvenile code requires "notice as soon as possible" to the parents that the juvenile is in custody (Section 211.131.2) and requires further that the child be "taken immediately and directly before the juvenile court or delivered to the juvenile officer or person acting for him" (Section 211.061.1). We observe, parenthetically, that use of the twenty persons as above would appear to represent an effort to comply with these important provisions of the juvenile code.

Under the reorganization, the clinical services department will evaluate juveniles to assist the court in determining disposition, including certification for trial as an adult, release from secure custody, appropriate type of commitment, early identification of psychological and psychiatric problems and evaluation of potential foster parents. The juvenile code authorizes the court to obtain examination of a child by a physician, psychiatrist or psychologist "in order that the condition of the child may be given consideration in the disposition of his case" (Section 211.161.1) and the juvenile judge insists the court cannot operate without this help.

Respondents point to Judge Corrigan's words that if the court-community intake departments were eliminated "Well, we'll live with it" and the remark in the staff report that if the county executive's proposed cuts are put into effect the service will "suffer," but we do not take this as a concession by relators that although it is convenient to have these positions filled they do not perform essential functions for the juvenile court. Judge Corrigan put it this way to the council: "That [the court-community intake department] now makes up the entire intake department for our court. . . . If I don't have these people . . . there are 9,500 referrals that are going to be handled by them this year. Take all that department [away] and you suggest to me or let the Administration suggest to me how I'm going to handle those cases when they come in.

"With regard to the clinical services. There are eight people in the clinical services department. We are mandated by statute to render to these children, not just for their sake but for our sake, for my sake as a judge, so that I can help make a decision, some clinical work-ups, some clinical testing so that I can determine whether a child ought to be certified, whether he should be committed or incarcerated. . . They also do clinical work-ups on foster parents. . . . [T]here is no where else we can get this done except from the private sector. . . . [I]t will cost at least $200,000 to perform the same service that we are performing for $135,000. Besides having these people there, and being able to call them into a pretrial conference, having them be able to confer with the deputy juvenile officers, with the legal department, and sometimes with the judge, makes the court run better. That is an essential element of this court."

It is not an answer to Judge Corrigan's foregoing statement of the need for the positions in dispute to say that the 1979 budget case recognized that these positions came about by reason of federal grant incentive programs now discontinued. Regardless of how they began, the relators

now make a showing that deletion of the requested positions and funds will seriously impair the functioning of the juvenile court. Respondents made no showing otherwise on the record before us, and, as stated, saw fit to stand on the record and not file a petition for review. Having failed to do so, we believe the rule laid down in *Weinstein, supra,* applies and mandamus therefore lies to require respondents to approve relator's budget estimates as modified by relators for juvenile court administration for the fiscal year 1980 without change and to appropriate funds for juvenile court administration in accordance with said budget estimates for the fiscal year beginning January 1, 1980.

The case of *State ex rel. Judges for the 22nd Judicial Circuit v. City of St. Louis,* 494 S.W.2d 39 (Mo. banc 1973), does not require otherwise. In that case it is true that despite the failure of the city council to file a petition for review, this court nonetheless declined to issue mandamus in favor of the circuit court with respect to its juvenile court budget. However, the distinction is that in that case the circuit judges made no effort by conventional means to resolve the dispute with the city council. The circuit judges were taking the position that the city council had no authority to do other than approve the budget request as submitted by the juvenile court. Therefore, we said, the basis for invoking the doctrine of the *Weinstein* case, *supra,* was not present. That is not true in the case now before us, as seen from facts and circumstances set forth above, where it is evident that the relators have made a good faith effort by conventional means to resolve their differences with respondents.

The alternative writ is made peremptory.

BARDGETT, C. J., and DONNELLY, WELLIVER, MORGAN and HIGGINS, JJ., concur.

RENDLEN, J., dissents in separate dissenting opinion filed.

RENDLEN, Judge, dissenting.

I respectfully dissent.

In the case of *In re 1979 Budget of the Juvenile Court of St. Louis,* 590 S.W.2d 900 (Mo. banc 1979), St. Louis County petitioned for review of the budget of the juvenile court pursuant to procedures prescribed by this Court in *State ex rel. Weinstein v. St. Louis County,* 451 S.W.2d 99, 102 (Mo. banc 1970). The petition challenged several items (salaries) as not reasonably necessary for the juvenile court's performance of its essential functions. This Court held that funding for salaries of some 22 employees who performed those functions was properly deleted from the budget requests of the juvenile court. The specific deletions, totaling $262,781, were as follows: (1) three positions (or employees) in the Youth Organization Unlimited (Y.O.U. project) at $41,099; (2) $55,910 to fund the local share of four programs related to prevention, detention, diagnostic services and treatment of juveniles as well as related family problems; (3) $55,268 requested for the "Regional Group Home"; (4) $110,504 for a diagnostic treatment services program. This Court sustained the county's petition and permitted deletion of these items. In this connection it was noted that "The projects disputed here were innovative and experimental, and encouraged by federal grant incentives." *Id.* at 902. The opinion also discussed three categories of "lawful expenditures" for juvenile court operations and the burden of proof in disputes concerning such items. *Id.* at 901. The Court concluded, "we find that the disputed expenditures are not required by statute or absolutely reposed in the discretion of the juvenile court, nor have they been shown to be reasonably necessary for the functioning of the court," and ordered the questioned items deleted from the 1979 budget of the juvenile court. *Id.* at 902.

It is fair to conclude that the deletion of salaries for those positions was upheld by this Court because the funding for these "innovative" programs began with federal LEAA funds and while those programs were valuable adjuncts of the juvenile court's activities, the county as the taxing and appropriating authority was not re-

quired to provide support for those federally funded projects under the circumstances.

As noted above, the 1979 budget request for 22 positions eliminated by this Court totaled $262,781. The salaries for those 22 positions in the 1980 budget (now in dispute) have risen to the sum of $353,089. The majority opinion holds *reconsideration* of these salaries is not barred by res judicata but instead requires the county to fund such positions because "the juvenile court judge has undertaken a complete reorganization of juvenile court administration . . ." and adds "the plan was devised and recommended in good faith by the juvenile judge, who is much closer to the problem than we are or the county council . . ."

The flaw I see in the majority opinion is that the very programs and the 22 positions deleted in 1979 are now required included by the Court, notwithstanding the fact that the record does not justify this reversal of position. The record here includes the pleadings and numerous exhibits incorporated by stipulation of the parties. Among the exhibits is a portion of a statement of Judge Corrigan (juvenile judge) to the St. Louis County Council. Judge Corrigan's statements indicate that the positions in question are not materially different from the functions considered in the 1979 budget. For example, the court's clinical services department was created in 1973 and the individuals assigned there provide treatment and diagnosis for children and parents as an adjunct to probation. Apparently this has been an ongoing program since 1973. Two of the positions in clinical services and 20 of those in the "Court Community Intake Department" (CCID) appear to be essentially the same as those deleted from the 1979 budget. During the year 1980 the court community services was incorporated "as a community based intake department" but Judge Corrigan admitted

such changes in nomenclature did little or nothing to alter the functions. They remain essentially the same. Highlighting this fact is this statement made by Judge Corrigan before the county council. "What we now call the CCID unit, or department which used to be, before we consolidated three departments into one, the CCS or Community Court Services Group . . ." He further conceded that services performed by the new CCID staff matched the pattern of services rendered by those same employees in prior years under the organization title of CCS.[1] Judge Corrigan then described the work of the juvenile officers and various assistants (mentioned in the principal opinion) and explained that the service is the same as that provided in the year 1979 and prior years for the juvenile court. While the testimony of Judge Corrigan emphasizes the desirability of the programs, it is clear from his testimony that the essential functions for the employees (positions) deleted by this Court in 1979 are virtually the same as those which this Court now requires the County to fund but at higher figures because of the inflationary spiral. Whether *the reorganization* is termed as a plan "devised and recommended in good faith" or as "an exercise in creative bookkeeping," the function of these employees remains the same and the Court's ruling last year in *In re 1979 Budget*, 590 S.W.2d 900 (Mo. banc 1979), coupled with this year's record should control. I would quash the preliminary writ.

---

1. Additional support for the view that the CCID positions perform the same function as the CCS positions for which this Court approved deletion last year is the Juvenile Court's own staff report entitled "Comments to Supervisor's Recommendations." This appears in the record as relator's exhibit # 1 attached to relator's petition for mandamus. There in reference to the clinical services and CCID positions contained in the 1980 budget request it is stated "These are essentially same as cut in 1979 Supervisor's recommendation."